### KOBY *v.* STATE OF INDIANA.

[No. 26,314. Filed November 1, 1935.]

Michael Boland, Joseph T. Markey, Ernest E. Owens and *Walter A. Whetsel,* for appellant.

*Philip Lutz, Jr.,* Attorney-General, and *James D. Sturgis,* Deputy Attorney-General, for the State.

TREANOR, C. J.—Appellant, defendant below, was charged with robbery by an affidavit[1] drawn under §10-4101, Burns Ind. St. Ann. 1933, §2416, Baldwin's 1934. Trial by jury resulted in conviction. On appeal he assigns as error the trial court's action in overruling the following motions filed by defendant:

1. Motion challenging the array and to quash the venire.
2. Motion to quash the affidavit.
3. Motion for directed verdict, at the close of the State's evidence, which motion was renewed at the close of all of the evidence.
4. Motion for new trial.
5. Motion in arrest of judgment.

It is also urged that the court's judgment was erroneous in providing that imprisonment be at the Indiana State Prison instead of at the Indiana Reformatory.

---

1. The affidavit charges that the defendant, on the first day of October, 1932, "did then and there unlawfully, feloniously and forcibly and by violence and putting Florence M. Skeen in fear, rob, take and steal from the said Florence M. Skeen two hundred ($200.00) dollars in money, then and there the property of the said Florence M. Skeen, . . ."

Appellant's motion challenging the array is based upon the alleged failure of the jury commissioners to comply with the statutory provisions for placing ■■ names in the box from which names prospective jurors are to be drawn.[2] The statute provides for the appointment of jury commissioners, directs them to take an oath, to be instructed by the court concerning their duties, and to "immediately, from the names of legal voters and citizens of the United States on the tax duplicate of the county for the current year, proceed to select and deposit in a box to be furnished by the clerk for that purpose, the names, written on separate slips of paper, of uniform shape, size and color, of twice as many persons as will be required by law for grand and petit jurors in the courts of the county, for all the terms of such courts to commence within the calendar year next ensuing."

It appears from appellant's verified motion that the jury commissioners were appointed on December 17, 1932, but that they did not meet to select and deposit names in the jury-list box until January 10, 1933. The substance of appellant's contention seems to be that the law required the commissioners to meet immediately and before the close of the calendar year of 1932 and to select names from the tax duplicates of the year 1932. But under the terms of §4-3301, Burns, etc., 1933, the circuit court can name the commissioners any time "during the last term beginning in each calendar year"; and in case the "last term beginning in each calendar year" happens to extend beyond the end of the current calendar year the circuit court can name the commissioners on or after January 1st of the following calendar year.

2. §4-3301, Burns Ind. St. Ann. 1933, §1266, Baldwin's 1934; Acts 1881 (Spec. Sess.), ch. 69, § 1, p. 557; Acts 1899, ch. 195, §1, p. 428; §4-3304, Burns, etc., 1933, §1267, Baldwin's 1934; Acts 1881, etc., §2.

In which case the commissioners necessarily would meet and select names after the close of the calendar year in which the "last term of court" had begun.

It is clear that no provision of the statute requires the jury commissioners to select and deposit names at any particular time, as a condition precedent to the exercise of their authority. Their authority is a continuing one during their term of office. If they fail to perform their duties the statute[3] gives the court ample power to deal with the situation; but nothing in the statute suggests that the action of the commissioners is a nullity in case they delay, even unreasonably, to perform their duties.

We infer from the allegations in the verified motion that in the instant case the jury commissioners selected names from the tax duplicate of the year 1933, which was the current year at the date of selection. This was a substantial compliance with the statute and effectuated its purpose even if the commissioners did not act as promptly as the statute contemplates. But the failure to act "immediately" was at the most an irregularity which did not in any manner prejudice the interests of the appellant.

The trial court did not err in overruling the motion to challenge the array and to quash the venire.

The court did not err in overruling the motions to quash the affidavit and to arrest judgment, which motions were based upon the alleged failure to state the value of the property taken. The statute defining robbery (§10-4101, Burns, etc., 1933, *supra*) makes it an offense to take "any article of value"; and the affidavit alleged the taking of "two hundred ($200.00) dollars in money." This constitutes

3. §4-3303, Burns, etc., 1933, §1271, Baldwin's 1934; Acts 1881, etc., *supra*, §8; §4-3309, Burns, etc., 1933; Acts 1881, etc., *supra*, §4.

a sufficient allegation of value in the property taken.[4]

Appellant urges that the verdict was not sustained by sufficient evidence. The evidence introduced by the State was to the following effect: On September 30, 1932, Florence M. Skeen lived alone in the town of Versailles. Her home was about 180 feet from the bank referred to in the evidence and 200 feet from the court house. At about 7:20 that night Koby, defendant below, and a man by the name of Quigley, called Whitey, came to her front door. She admitted them to the house and they told her they were officers who had come to take her to the Women's Prison at Indianapolis; that they had 25 charges against her. She had previously served a term of imprisonment there. The men displayed a badge and a gun, and Koby grabbed her by the arm and started toward the door with her. She resisted and objected to going, whereupon Koby suggested that they could not take her in that state of mind and would have to let her calm down. They then took her to a bedroom where she sat in front of the dresser. Koby left the room and Whitey told her that they would release her for $500.00. She said she had no money. When Koby returned he finally said he would release her for $200.00, which she agreed to obtain the next morning from the bank. The companion left, saying he would be back in the morning. and Koby remained, sitting in front of Miss Skeen, with a gun on his knee. At about 9:30 they went to the kitchen and sat there talking and playing rum until 11:40 when Whitey returned, knocking on the door.

---

4. Appellant was convicted of the crime of robbery. "Appellant insists that the judgment should be reversed because the State did not prove the value of the property taken from the prosecuting witness. The indictment charged the taking of ten dollars in money. This was sufficient under the statute. Section 1750, R. S. 1881; *Graves* v. *State*, 121 Ind. 357. The proof was that it was ten dollars in money. No proof was necessary as to its value, money being the measure of values." *McCarty* v. *State* (1891), 127 Ind. 223, 225, 26 N. E. 665.

Miss Skeen said "My God, is that some of your bunch?" but Koby said "Let them in, I will protect you." Whitey then asked for the room with two beds in it and she showed it to them. Koby removed his coat and shirt and lay down on one of the beds. Miss Skeen, with her big dog, went to her own room, next to the one Koby was in, and locked her door. She heard the men going up and down the stairs and then she pulled the switch which turned out all the lights in the house. She took her rings and gun and crawled out a window on to a roof, but thinking she heard someone she returned to her room and sat on the bed until 4 A. M. She then went downstairs to let her dog out. Whitey was sitting at the foot of the stairs with a gun and Koby was in the hall upstairs. She went back upstairs, dressed and then came down and prepared breakfast for the three. Whitey went with her to feed her ducks and both Koby and Whitey went with her to get a bottle of milk from her porch. She went out again to get a better view of Koby's car so as to see its license plate and she wrote down the number. She washed her dishes and at 8:20 Koby told her it was about time to go get the money. The two men started to go to the bank with her but she told them that they were not going with her, that they would rob the bank. The three left the house, the two men going to their car and Miss Skeen walking to the bank, slowly followed by the two men, who drove past the bank. When Miss Skeen arrived at the bank she told the bank officials to lock the door, which they did, and she pointed out Koby's car to them. She told the cashier "everything that had happened" and remained in the bank about ten minutes, with the doors locked. She gave the cashier her note for $200.00 and obtained $200.00 from him. She immediately left the bank and returned to the porch of her home, where Whitey met her. He "grabbed" her "by the arm and started across the yard"

with her, taking her to Koby's car where Koby was sitting. Koby asked her: "Did you get it?" She replied "Yes" and handed him the money—$200.00. She asked "What assurance do I have that you will not be back tomorrow night after two hundred dollars more?" Koby asked: "Did you tell this to anybody? You had better keep still about this, if you don't you will take a one-way ride." Whitey said: "You will get some information from us next week that you will be glad to pay for." After she gave the money to the men she returned immediately to the bank and talked to the cashier again, then went to a store and called the sheriff. She testified that when the men first came to her house she thought they were "federal men"; that she changed her mind; that she went to the bank, got the money and gave it to Koby because she was afraid they would do her bodily harm if she did not.

The jury, by its verdict, found that the defendant had robbed Florence Skeen, the prosecuting witness, of two hundred dollars. The defendant admitted that he obtained the two hundred dollars from Florence M. Skeen. We must hold that the evidence sustained the verdict if the jury had before it facts from which it reasonably could infer that the defendant had forcibly and feloniously taken the two hundred dollars from Florence M. Skeen by violence or by putting her in fear. There is no evidence that physical violence was used to effectuate the actual transfer of the money. But actual use of violence is not essential to the commission of robbery if the conduct of the alleged robber is such as to put the victim in fear of bodily injury in case of non-compliance with the robber's demand.

> "Putting the victim in fear of bodily injury is sufficient intimidation to sustain a charge of robbery. Actual fear need not be proved, as a legal presumption of fear will arise from facts clearly indicating a cause therefor. It is not necessary that

the victim should have feared bodily injury if he did not resist, it being sufficient if he feared it in the event he should resist." 54 Corpus Juris, §§33, 34, 35 and notes.

Obviously, the victim should not be required to test the sincerity of his attacker's threat to use violence if the conduct of the attacker is such that the victim reasonably believes that he will be subjected to personal violence in case of non-compliance with the attacker's demands.

In the instant case the evidence clearly was sufficient to justify the jury's believing that the prosecuting witness was in fear of personal violence up to the time that she separated from the defendant and his companion and started to the bank to obtain the two hundred dollars. The jury reasonably could have believed that the prosecuting witness was in constant fear throughout the night of being "kidnapped" or "taken for a ride" and when she started for the bank to obtain the two hundred dollars the defendant and his companion "drove down slowly right behind" her; and they drove slowly past the bank while she was obtaining the money. When the prosecuting witness returned to her home with the two hundred dollars and was in the act of entering the house "Whitey" "grabbed" her "by the arm and started across the yard" with her. The evidence was sufficient to justify the jury's concluding that Florence Skeen's mental and emotional condition throughout the night and until she gave the money to appellant was as described by her in the following testimony:

"I was almost crazy I was so scared. . . .Well I was afraid if I didn't do what they wanted me to do, well they said if I told anybody anything or did anything they would take me for a ride or kidnap me, I was so distressed I didn't have any control of myself. When I got the money I took it back to the house. . . . I was afraid they would do me bodily harm if I did not." (i.e., get the money and give it to the defendant).

Perhaps the prosecuting witness was in fact safe from any immediate injury from the defendant when she was in the bank; and it seems obvious now that she or the banker could have telephoned to the sheriff's office for aid. (Why the banker did not give an alarm we can only surmise. He was a State's witness and the defendant did not question him on this point.) But the jury's problem was not to determine whether it would have been possible for the prosecuting witness, or the banker, to have foiled the defendant and his companion but simply to determine whether, in view of all the circumstances, the victim continued in a state of fear of personal violence until she had obtained and delivered the money to the defendant. And we cannot say that the jury was wrong in concluding both that the prosecuting witness continued to be in a state of terror and intimidation during the short period of her separation from the defendant and his companion, and that she was coerced by fear of personal violence to obtain and deliver the money to the defendant.

The evidence was sufficient to sustain the verdict.

The remaining errors which are presented by appellant's brief were expressly waived at oral argument.

The judgment of the Ripley Circuit Court is affirmed.

Tremain, J., not participating.